BLUE CROSS OF MARYLAND, INC., ET AL. *v.*
FRANKLIN SQUARE HOSPITAL ET AL.

[No. 53, September Term, 1975.]

*Decided March 2, 1976.*

94

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Richard Landfield,* with whom were *Joseph T. Brennan, 2d,* and *F. M. Gloth, Jr.,* on the brief, for Blue Cross of Maryland, Inc., part of appellants. *John T. Brooks, Special Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for Health Services Cost Review Commission, part of appellants. *Charles J. Steele,* with whom were *Kevin W. Carmody* and *Jo V. Morgan, Jr.,* on the brief, for Group Hospitalization, Inc., other appellant.

*James J. Doyle, Jr.*, with whom was *John B. Jaske* on the brief, for Hospital Appellees and *William Gar Richlin*, with whom were *Roger D. Redden* and *Piper & Marbury* and *Thomas J. Gillooly* and *Charles M. Preston* on the brief, for Health Insurance Association of America, other appellees.

ELDRIDGE, J., delivered the opinion of the Court.

By Chapter 627 of the Acts of 1971, Maryland Code (1957, 1971 Repl. Vol., 1975 Cum. Supp.), Art. 43, §§ 568H-568Y, the General Assembly established the Maryland Health Services Cost Review Commission. The Act vested the Commission with jurisdiction over the costs and rates of hospitals, health care institutions and related institutions located in Maryland. The Commission was charged with the responsibility of assuring that hospital "rates are set equitably among all purchasers or classes of purchasers without undue discrimination or preference." In order to accomplish this, the Commission was given "full power to review and approve the reasonableness of rates established or requested" by hospitals subject to its jurisdiction. At issue here is the meaning of the terms "purchaser" and "classes of purchasers" as used in the statute. Also at issue is the scope of the Commission's authority to "review and approve" the reasonableness of established or proposed hospital rate structures.

The Health Services Cost Review Commission was designed to "cause the public disclosure of the financial position of all hospitals and related institutions and the verified total costs actually incurred by each such institution in rendering health services." Art. 43, § 568H (a). The Commission was also intended to insure the financial integrity of hospitals and related institutions, and to "concern itself with solutions when [financial] resources are inadequate." *Ibid.* In order to carry out its statutory responsibilities, the Commission was vested with certain powers, including the power to promulgate rules and regulations, hold public hearings, conduct investigations, and "[e]xercise, subject to the limitations and restrictions herein imposed, all other powers which are reasonably

necessary or essential to carry out the expressed objects and purposes of this subtitle." Art. 43, § 568M (3). The law further provides, Art. 43, § 568U:

"(a) From and after July 1, 1974, the Commission shall have the power to initiate such reviews or investigations as may be necessary to assure all purchasers of health care hospital services that the total costs of the hospital are reasonably related to the total services offered by the hospital, that the hospital's aggregate rates are reasonably related to the hospital's aggregate costs; and that rates are set equitably among all purchasers or classes of purchasers of services without undue discrimination or preference.

"(b) In order to properly discharge these obligations, the Commission shall have full power to review and approve the reasonableness of rates established or requested by any hospital subject to the provisions of this subtitle. No hospital shall charge for services at a rate other than those established in accordance with the procedures established hereunder.

\* \* \* "

In October 1974, the Commission adopted its first set of rules and regulations concerning hospital rate applications and approval. 1 Maryland Register 177 (November 27, 1974). The regulations contained provisions authorizing rate differentials to qualifying "third-party-purchasers" in all hospitals throughout the state, regardless of the financial circumstances of an individual hospital. Rule 10.36.10.93, 1 Maryland Register at 188. The regulations also contained procedures by which the hospitals would submit proposed rate schedules of the hospital for the Commission's review and approval. Some of the regulations, such as the one providing for purchaser differentials, attempted to incorporate by reference certain portions of "Rate Approval Guidelines" issued by the Commission in September 1974.

The guidelines were not themselves promulgated as rules and regulations pursuant to the provisions of the Administrative Procedure Act, Code (1957, 1971 Repl. Vol., 1975 Cum. Supp.), Art. 41, §§ 245-248.

Franklin Square Hospital, along with nineteen other hospitals, all voluntary, nonprofit hospitals located in the State of Maryland, filed a bill for declaratory judgment in the Circuit Court for Baltimore County. The bill challenged portions of the regulations governing hospital rate applications, and the incorporation by reference of provisions of the Commission's guidelines into the regulations. Subsequently, four other voluntary, nonprofit hospitals were added as plaintiffs. The hospitals sought a declaration that the Commission only had authority to regulate rates on a hospital-by-hospital basis, rather than on a statewide basis as the Commission had attempted to do. Additionally, the hospitals sought a judgment declaring that the guidelines were not properly adopted as rules and therefore were not binding on the hospitals, and that the Commission could not properly incorporate any of the guidelines by reference in its formally adopted rules and regulations.

Subsequently, at various stages of the proceedings, Blue Cross of Maryland, Inc., the Health Insurance Association of America, and Group Hospitalization, Inc., were granted leave to intervene. Blue Cross is a nonprofit Maryland corporation offering hospitalization expense coverage to its subscribers who constitute about one-third of the population of Maryland. Group Hospitalization, Inc., is the "Blue Cross" plan for the Washington, D. C., metropolitan area, including portions of Montgomery and Prince George's Counties in Maryland, and is qualified to do business in this State. Both Blue Cross and Group Hospitalization, Inc., are regulated by the provisions of Code (1957, 1972 Repl. Vol., 1975 Cum. Supp.), Art. 48A, §§ 354-361A which govern nonprofit health service plans.[1] Health Insurance Association of America, a

---

1. Since the positions of Blue Cross and Group Hospitalization, Inc., are identical in this proceeding, we shall hereinafter refer to them as "Blue Cross."

Delaware corporation, is an association of 322 health insurance companies of which 171 are qualified to do business in Maryland.

At trial, the hospitals and the Commission entered a stipulation regarding certain facts as well as several contentions of the parties. The only witness, Dr. John Cook, testified on behalf of the Commission with respect to the guidelines and the rationale behind the differentials. The chancellor, however, thereafter stated that the principal issues to be decided were legal, and that no testimony was needed. He then characterized those issues:

> "*First* is whether the Guidelines are really rules and regulations which have to be approved under Article 41. *Second,* is the power of the Commission regarding hospital rates. *Third,* whether the Guidelines are incorporated into the adopted rules and regulations by reference or not. *Fourth,* is the power of the Commission to interfere with the business operation of the third party, major third party payors. *Fifth,* whether the differentials and the Guidelines are within the Legislative Mandate."

The remainder of the circuit court proceedings was devoted to legal argument by the parties. The court indicated, however, that issues concerning the differentials and the Commission's power over third party payors would be deferred for a later hearing. Consequently, arguments during the proceedings were addressed primarily to the first three issues as characterized by the chancellor.

Subsequently, the chancellor issued an opinion and, about six weeks later, an "order of final judgment." The final judgment order declared, *inter alia:*

> "A. In each case before it the Commission shall determine whether the rates charged by a hospital are reasonable.
>
> "B. Such a determination shall be made for each institution individually rather than for all or for a number of hospitals on a collective basis.

"C. Under the Act purchasers means only patients. 'Classes of purchasers' refers to patients classified according to recognized therapeutic categories of treatment within the hospital or patients classified in the same manner as the hospital identifies its patient service centers for purposes of the Rate Review System. For example, medical-surgical patients and obstetrical patients may be different classes of purchasers.

\* \* \*

"F. The Commission is further to determine that, in each hospital, rates are set equitably among all purchasers or classes of purchasers of services without undue discrimination or preference. Medicare, Blue Cross, Medicaid and private insurance companies are not to be treated by the Commission as purchasers or classes of purchasers within the meaning of the Act. Further, the term 'equitably' as used in the Act means fairly — not equally, and the term 'all', as used in the Act, means all purchasers or classes of purchasers regardless of the area of the hospital from which they purchase services or the types of services purchased. The term 'undue' as used in the Act means not appropriate or suitable, improper, unjustifiable; going beyond what is appropriate, warranted, or natural; excessive.

"G. In the event the Commission finds that the rate structure charged or proposed by the hospital is reasonable it shall approve the rates even though some other rate structure might also be reasonable.

"2. The Guidelines of the Commission published by the Commission October 15, 1974 are rules and regulations which must be adopted and promulgated pursuant to Maryland Code, Article 41, Sections 244-256 A, inclusive, (Administrative Procedure Act) and Maryland Code (1974 Cumulative

Supplement), Article 41, Sections 256 B-256 S, inclusive. As it is stipulated that the Guidelines have not been adopted and promulgated in accordance with these applicable laws, they are invalid and of no effect.

\* \* \*

"7. Those portions of the aforementioned Rules of Procedure relating to Differentials beginning on page 39 of the Rules are invalid to the extent that certain provisions of the Guidelines are incorporated by reference."

Blue Cross and the Commission took an appeal to the Court of Special Appeals, and we issued a writ of certiorari prior to decision by the Court of Special Appeals.

In this Court, Blue Cross and the Commission argue that the circuit court erred in ruling that the term "purchasers" in the Act "means only patients." Rather, they contend that the term "purchasers" was meant to embrace "third party payors" such as Blue Cross. The Commission further asserts that the words "classes of purchasers" do not pertain solely to recognized therapeutic categories of treatment. Instead, the Commission contends that the term "classes of purchasers" also refers to "different types of purchasers who make differing arrangements for the purchase and payment" of hospital services.

Blue Cross further argues that due process of law was denied because the circuit court decided the issue relating to whether Blue Cross was a "purchaser" after having said that the issue would be reserved for determination in a subsequent hearing. Thus, Blue Cross contends, it was denied the chance to be heard with respect to the meaning of the term "purchasers."

Blue Cross additionally argues that it was denied due process of law because the bill for declaratory judgment did not raise the issue of whether it was a "purchaser" or within a "class of purchasers" under the Act. In fact, Blue Cross

insists, the bill of complaint assumed that it was a purchaser and contested only the statewide differential which was permitted under the regulations.

Another issue raised in this Court involves a somewhat different alignment of the parties. The Commission contends that the circuit court was in error in holding that the Commission was required to approve a reasonable rate structure even if it were to decide that another rate structure would be "more reasonable." The Commission argues that it has the power to approve optimum schedules of rates, and may disapprove or modify less desirable rate schedules even if they might also be deemed "reasonable." The hospitals, the Health Insurance Association of America and Blue Cross, on the other hand, all contend that the Commission may not substitute its view of reasonableness for that of a hospital, and that the Commission must approve any submitted rate structure as long as it is a "reasonable" one.[2]

## (1)

Generally, due process requires that a party to a proceeding is entitled to both notice and an opportunity to be heard on the issues to be decided in a case. *Standard Oil Co. v. Missouri,* 224 U. S. 270, 281, 32 S. Ct. 406, 56 L. Ed. 760 (1912); *Armstrong Cork Co. v. Lyons,* 366 F. 2d 206 (8th Cir. 1966); *see also Ottenheimer Pub. v. Employ. Sec. Adm.,* 275 Md. 514, 520, 340 A. 2d 701 (1975); *Accrocco v. Splawn,* 264 Md. 527, 534, 287 A. 2d 275 (1972); *Travelers v. Nationwide,* 244 Md. 401, 409, 224 A. 2d 285 (1966); *Balto. County v. White,* 235 Md. 212, 220, 201 A. 2d 358 (1964). Thus, unless an issue decided by the court is raised by the pleadings, or a party otherwise receives adequate notice of an issue during the course of a proceeding, due process is denied. *United*

---

**2.** No appeal has been taken from the chancellor's order invalidating the Commission's guidelines and invalidating the rule permitting rate differentials to the extent that the rule incorporated provisions of the guidelines. Moreover, no issue directly concerning the propriety of granting any particular differential is before us.

*Transportation Union v. State Bar of Michigan,* 401 U. S. 576, 581, 91 S. Ct. 1076, 1080, 28 L.Ed.2d 339 (1971); *see Reynolds v. Stockton,* 140 U. S. 254, 265-266, 11 S. Ct. 773, 35 L. Ed. 464 (1891); *Travelers v. Nationwide, supra,* 244 Md. at 406-410.

Blue Cross contends that it was denied due process of law because the issues below, as framed by the bill for declaratory judgment, did not concern the status of Blue Cross as a "purchaser." Instead, Blue Cross argues, the bill assumed that Blue Cross was a "purchaser" entitled to a "purchaser differential" in determining the rates of individual hospitals, although the bill did challenge the granting of differentials on a statewide basis. Therefore, Blue Cross concludes, it was denied due process of law because it had no notice that the meaning of "purchaser" was in issue.

We believe that Blue Cross had adequate notice that its status as a "purchaser" within the meaning of the statute was at issue. The relief prayed for by the hospital's bill for declaratory judgment included:

"3. That a judgment be entered declaring that Rule 10.36.10.02I is illegal and beyond the authority granted the Commission under Chapter 627 and it is thereby deleted from the rules and regulations of the Commission."

Rule 10.36.10.02I (later codified as Rule 10.36.10.93, 1 Maryland Register at 188) provides for purchaser differentials and working capital differentials to "third party purchasers." By attacking the Commission's regulation in its entirety, the hospitals placed in issue the propriety of granting differentials to third parties at all, not merely the propriety of such differentials on a statewide basis as Blue Cross contends. Additionally, the Commission's guidelines treated Blue Cross as a purchaser, and the guidelines were attacked by the hospitals in their entirety.[3]

---

3. Moreover, Blue Cross was again put on notice of the issue over the

Blue Cross also contends that, even if the meaning of the term "purchasers" was in issue, it was denied due process of law by the trial court's decision interpreting "purchasers" and "classes of purchasers." Blue Cross points out that the trial court expressly reserved for later determination

> "the questions involving differentials and the Commission's authority over third-party purchasers. . . . By defining 'purchaser' *sua sponte* the Court below . . . effectively decided the two questions expressly reserved for later argument, for the Commission has no authority of any kind over third-party payors if they are not 'purchasers' and the differentials described in Rule 10.36.10.93 are granted only to third-party purchasers, a class the Lower Court has totally eliminated."

According to Blue Cross, by determining the issues with which Blue Cross was "vitally concerned," after expressly reserving them for a subsequent hearing, and without giving Blue Cross an opportunity to be heard on those issues, the circuit court denied it due process of law. Essentially, Blue Cross's complaint in this regard is that the chancellor's action deprived it of its opportunity to present oral argument concerning the meaning of the terms "purchasers" and "class of purchasers."

Due process of law is not "a term of fixed and invariable content." *Communications Comm'n v. WJR*, 337 U. S. 265, 275, 69 S. Ct. 1097, 93 L. Ed. 1353 (1949). With respect to

---

meaning of "purchaser" during the course of oral argument before the circuit court. Counsel for the hospitals argued:

> "[T]he hospitals would proffer that every patient, and we think the meaning of the, no undue discrimination between purchasers and classes of purchasers, we believe should be interpreted that very way, that the only way you can justify a difference in charge between one purchaser and parenthetically to me as a patient, he is the fella that buys the service. The question of who pays it for him is a matter between him and a somebody that he contracted with."

This contention was apparently accepted by the trial judge in open court when he later stated, "I look on the purchaser as each patient being a purchaser."

legal issues, due process does not necessarily require that parties be given an opportunity to present argument. In *Communications Comm'n v. WJR, supra,* WJR's petition for reconsideration of an administrative order granting a construction permit to another radio station was denied without oral argument, after the other station challenged the legal sufficiency of WJR's petition. The Supreme Court held that the action of the administrative tribunal in not affording WJR an opportunity for oral argument did not constitute a denial of due process. As the Court stated, 337 U. S. at 276, "Certainly the Constitution does not require oral argument in all cases where only insubstantial or frivolous questions of law, or indeed even substantial ones, are raised." While *Communications Comm'n v. WJR, supra,* dealt with administrative proceedings, it has been held applicable to judicial proceedings also. *N.L.R.B. v. Local No. 42, Int. Ass'n of Heat & F. I. & A. Wkrs.,* 476 F. 2d 275 (3d Cir. 1973); *Helene Curtis Industries v. Sales Affiliates,* 233 F. 2d 148 (2d Cir. 1956). For other cases holding that there is no absolute constitutional right to argue questions of law *see N.L.R.B. v. Sun Drug Co.,* 359 F. 2d 408 (3d Cir. 1966); *United States v. O'Connor,* 291 F. 2d 520 (2d Cir. 1961); *Fritts v. Fritts,* 11 Md. App. 195, 273 A. 2d 648 (1971).

In this case, there are no disputed issues of fact the resolution of which is critical to the question before us. That question is one of statutory interpretation. Moreover, Blue Cross did proffer certain documents before the chancellor issued his order of final judgment. The material consists of sample Blue Cross invoices, contracts of Blue Cross with affiliated and participating member hospitals, and documents describing Blue Cross payment and benefit plans. These documents have been fully considered by this Court on this appeal. Further, any relevant legal arguments by Blue Cross as to the meaning of the term "purchaser" were still open for presentation in this Court. *United States v. O'Connor, supra,* 291 F. 2d at 524. We therefore believe that Blue Cross was not harmed by any failure to present legal argument below.

## (2)

Blue Cross and the Commission argue that the circuit court was wrong, as a matter of law, in defining the term "purchasers" to mean only "patients." The meaning of the word "purchasers," Blue Cross claims, includes all those who actually render payment in money for hospital services, including third party payors. Blue Cross contends that its subscribers are merely third party beneficiaries of purchase contracts of Blue Cross.

A statute should be construed according to the ordinary and natural meaning of the language used, absent some indication that the Legislature intended to use a term in an abnormal sense. *Bright v. Unsat. C. & J. Fund Bd.*, 275 Md. 165, 169, 338 A. 2d 248 (1975); *Md.-Nat'l Cap. P. & P. v. Rockville*, 272 Md. 550, 556, 325 A. 2d 748 (1974); *Radio Com., Inc. v. Public Serv. Comm'n*, 271 Md. 82, 93, 314 A. 2d 118 (1974); *City of Gaithersburg v. Mont. Co.*, 271 Md. 505, 511, 318 A. 2d 509 (1974); *Grosvenor v. Supervisor of Assess.*, 271 Md. 232, 237-238, 315 A. 2d 758 (1974). In our view, the ordinary and natural meaning of the term "purchasers," with no further descriptive language being employed, would not encompass an insurer like Blue Cross. Instead, a "purchaser" of a service would normally refer to the person obtaining that service, absent some clear indication to the contrary. While a consumer of a service, instead of having to pay for the service with his own funds, may choose instead to pay insurance premiums and have the insurance company assume the obligation of paying for the service he receives, the fact remains that it is the consumer who is ordinarily deemed the purchaser.

Blue Cross is essentially engaged in the business of selling insurance, *Baltimore Co. Hosp. v. Md. Hosp.*, 234 Md. 427, 431, 200 A. 2d 39 (1964). It is regulated by the provisions of the Insurance Code governing "Nonprofit Health Service Plans," Code (1957, 1972 Repl. Vol., 1975 Cum. Supp.), Art. 48A, §§ 354-361A, and is subject to the jurisdiction of the Insurance Commissioner. Blue Cross, through the collection of insurance premiums, provides medical expense coverage for its insureds. It does not provide medical services. It is the

patient who obtains medical treatment from independent hospitals which may or may not be affiliated with Blue Cross. The mere fact that Blue Cross subscribers have chosen to pay for hospital costs in a manner different from self-pay patients does not alter the fact that it is the subscribers who are purchasing hospital services through the medium of Blue Cross.

Blue Cross contends that, although it may be deemed an insurer for certain purposes, it is different from other insurers, and that it is a "purchaser" within the meaning of the Act even though such other insurers may not be. Blue Cross attempts to distinguish itself from other insurers in that it pays the hospital directly for services rendered to subscribers, as opposed to most insurers who merely indemnify their insureds for payments which the insureds have made to the hospital. However, it is apparent from the record that Blue Cross is in some respects an indemnity insurer. For example, when a subscriber receives treatment from doctors or hospitals not associated with Blue Cross, payment is made by Blue Cross directly to the subscriber. And where a subscriber obtains benefits at a non-Blue Cross affiliated hospital, the subscriber is entitled to "payment *or* reimbursement." We further note that in some instances regular indemnity insurance companies may make direct payments to physicians or hospitals instead of indemnifying their subscribers. To make the statutory term "purchasers" depend on whether the third party payor pays the hospital directly or reimburses the subscriber would elevate mere form over substance. *Cf. Kopp v. Home Mutual Insurance Co.*, 6 Wisc. 2d 53, 94 N.W.2d 224, 226 (1959).

Blue Cross also relies on the fact that it makes some advance payments to hospitals, rather than solely compensating the hospitals for services previously rendered. While Blue Cross does make advance payments to member hospitals based on a statistical probability that a certain number of its subscribers will obtain services, there is a periodic adjustment in which payments made by Blue Cross, in excess of services actually rendered, are returned to Blue Cross. Thus, Blue Cross, rather than "purchasing" medical

services in the ordinary sense of that word, is merely compensating hospitals for medical services upon the condition that those services are actually rendered to Blue Cross's insureds.

Finally, Blue Cross contends that the word "purchaser" has wide currency in the health care industry, of which the Legislature was presumably aware, and that the term is generally understood to include entities such as Blue Cross. In support, Blue Cross points to sources which refer to Blue Cross as a "purchaser." For example, it cites Title XV, § 1533 of the National Health Planning and Resources Development Act of 1974, 42 U.S.C. 300n-2, which provides in part:

"(d) The Secretary [of HEW] shall establish the following within one year of January 4, 1975:

* * *

"(3) A uniform system for calculating rates to be charged to health insurers and other health institutions payors by health service institutions. Such system shall:

* * *

"(D) Provide that differences in rates to various *classes of purchasers (including health insurers, direct service payors, and other health institution payors)* be based on justified and documented differences in the costs of operation of health service institutions made possible by the actions of such *purchasers.*" (Emphasis added.)

Blue Cross additionally refers to studies conducted within the hospital industry, and to other materials in the health care field, all of which, it contends, demonstrate that Blue Cross is generally considered a "purchaser" in health care legislation. However, the sources cited in support of Blue Cross's contention, as illustrated by the above-quoted federal statute, generally attach a clarifying prefix to the

term "purchaser" when referring to entities such as Blue Cross, *e.g.,* "health insurers" or "third party payors." Indeed, some of the material relied on by Blue Cross may suggest that a third party payor is deemed a "purchaser" of health care services only when expressly referred to as such.

In sum, we hold that Blue Cross is not a "purchaser" within the meaning of Art. 43, §§ 568H (b) and 568U (a). In so holding, however, we are of the view that the chancellor's order defining "purchasers" does require modification. The chancellor held that "[u]nder the Act purchasers means *only* patients." (Emphasis supplied.) It may be that another person besides the patient may be a "purchaser" under the statute. For example, where a parent pays for the hospital expenses of his child, the parent, rather than the child, might be considered the "purchaser," although this distinction may have no practical effect upon the administration of the statute. The circuit court order also adjudicated the status of Medicare and Medicaid, although the status of those programs was not at issue, and the governmental entities administering the programs were not parties. Upon remand, the order of the circuit court should be modified to reflect that Blue Cross is not a purchaser, and it should not attempt to define the scope of "purchasers" for all purposes.

(3)

The Commission contends that the circuit court erred in holding that patients must be classified solely "according to recognized therapeutic categories of treatment within the hospital." However, the chancellor did not expressly limit "classes of purchasers" to therapeutic classes. Although he did say that "purchasers means *only* patients," in defining "classes of purchasers" the chancellor did not state that the *only* permissible basis of classification of purchasers was along therapeutic categories. In any event, while in most instances therapeutic categories would seem to be the appropriate basis of classifying purchasers, we agree with the Commission that it is not necessarily the only basis for such classifications.

The statute provides "that rates be set equitably among all purchasers or classes of purchasers of services without undue discrimination or preference." § 568U (a). It is clear, of course, that in order to constitute a "class of purchasers," the individual constituents of that class must themselves be "purchasers." Although the Act is silent concerning the basis for grouping purchasers so as to constitute classes, the statute was intended, in part, to insure that rates charged to patients reflect fairly the cost of care provided the patients. *See* § 568U (b). Thus, it would seem that the Commission is empowered to adopt any reasonable basis for classifying purchasers for particular purposes if such classification reflects the cost of hospital care on an equitable basis. If it can be demonstrated, for example, that any class of purchasers directly cause actual savings or additional expenses to a particular hospital, then that class of purchasers may be accorded rates which reflect the actual savings or expenses. Under Rules 10.36.10.94A (5) and 10.36.10.94B (1), Blue Cross is made a designated interested party for all rate review proceedings. As the hospitals point out in their brief (Brief of Appellee Hospitals, at 20):

"It may be that Blue Cross can offer evidence that its subscribers make up a large share of the patients of this hospital. Further, it may show its contract with the hospital provides for 'current financing' to the hospital in an amount equal to its average accounts receivable from Blue Cross subscribers. Blue Cross may also offer proof that its method of doing business makes it cheaper for the hospital to treat Blue Cross subscribers than other patients. If that evidence is sufficiently convincing, the Commission can modify the hospital's rates to the extent that they reasonably reflect these cost savings. That modification, though apparently discriminatory in favor of Blue Cross subscribers, would not constitute 'undue discrimination' within the meaning of the Act under these circumstances."

(4)

The Commission contends that the trial court's order requiring the Commission to approve a proposed hospital rate structure if it is found to be reasonable, even though another rate structure might also be reasonable and preferable, "impinges upon and unduly circumscribes the Commission's authority to approve, disapprove or modify the hospital's rates . . . ." The Commission argues instead that it is "charged by law to approve that rate structure which it finds to be the optimum, $i.e.$, that which produces the most efficient and effective hospital services at the least cost to the purchaser of the services."

The hospitals, on the other hand, argue that they may choose any rate structure within a zone of reasonableness. The Commission, they allege, may not substitute its view of reasonableness for that of the hospitals. If the Commission determines that the proposed rates are reasonable, even though different rates might be more reasonable, it has no alternative but to approve them.

The Health Services Cost Review Commission is required to permit institutions under its jurisdiction "to charge reasonable rates which will permit the institution to render effective and efficient service in the public interest . . . ." Art. 43, § 568V (2) (A) and (B). In order to accomplish this, the Commission is extended the "full power to review and approve the reasonableness of rates established or requested by any hospital" subject to its jurisdiction. § 568U (b).

In our view, the Legislature, in delegating to the Commission power to review and approve the reasonableness of hospital rates, intended that the Commission have the power to approve those rates which it considers best designed to effectuate the purposes of the statute. The Commission is not required, as the hospitals contend, to defer to the hospital's view of reasonableness in cases of conflict. If, in the Commission's opinion, a proposed rate structure is designed to further the purposes of the statute less effectively than another rate structure would, then it would be proper for the Commission to reject the proposed rates.

The provisions of the Act reflect the legislative intent that the Commission have broad authority over the financial affairs of hospitals and that it should only approve those rates *best* designed to assure fair costs and fiscal integrity. Under § 568H (a) the Commission is given the responsibility "to keep itself informed as to whether the financial resources of each institution are sufficient to meet its financial requirements and to concern itself with solutions when resources are inadequate." Section 568-O requires the Commission to

> "specify a uniform system of accounting and financial reporting, including such cost allocation methods as it may prescribe, by which hospitals and related institutions shall record their revenues, expenses, other income and other outlays, assets and liabilities, and units of service."

These two sections indicate that the Legislature intended the Commission to be deeply concerned with the hospital industry's financial structure and fiscal health.

The basic provision of the statute setting forth the Commission's authority over rates is § 568U, which provides:

> "(a) From and after July 1, 1974, the Commission shall have the power to initiate such reviews or investigations as may be necessary to assure all purchasers of health care hospital services that the total costs of the hospital are reasonably related to the total services offered by the hospital, that the hospital's aggregate rates are reasonably related to the hospital's aggregate costs; and that rates are set equitably among all purchasers or classes of purchasers of services without undue discrimination or preference.

> "(b) In order to properly discharge these obligations, the Commission shall have full power to review and approve the reasonableness of rates established or requested by any hospital subject to

the provisions of this subtitle. No hospital shall charge for services at a rate other than those established in accordance with the procedures established hereunder.

"(c) In the interest of promoting the most efficient and effective use of health care hospital service, the Commission may promote and approve alternative methods of rate determination and payment of an experimental nature that may be in the public interest and consistent with the purposes of this subtitle."

As can be seen, the statute requires the Commission to assure not only that rates are reasonable in light of services and costs, but also that rates be set equitably and without undue discrimination. Under subsection (b) the Commission is granted "full power" to review and approve rate schedules, including the power to disapprove rate schedules which are already in operation. Moreover, under subsection (c), in order to achieve the "most efficient and effective" use of hospital services, "the Commission may promote and approve alternative methods of rate determination and payment of an experimental nature." The power to promote alternate methods of rate determination which are experimental in order to assure the *most* efficient and effective use of services is inconsistent with the hospitals' contention that the Commission may not disapprove a "reasonable" rate even if the Commission does not believe that such rate promotes the most efficiency and effectiveness.

Section 568V provides in subsection (2) (A) with respect to nonprofit institutions, and in subsection (2) (B) with respect to profit-making institutions, that the rates permitted by the Commission must not only be reasonable but must also "permit the institution to render effective and efficient service in the public interest." And, under § 568V (3) the Commission must, in determining reasonable rates, "take into account all the costs of complying with the recommendations of appropriate areawide and State

comprehensive planning health agencies to make compliance possible with Maryland comprehensive health planning law . . . ." Under this section, the Commission is required to include not only financial considerations in determining reasonable rates, but it must also consider and coordinate numerous other recommendations of health care officials whose decisions may bear on hospital rates.

Furthermore, under § 568M (3) the Commission is granted the power to "[e]xercise, subject to the limitations and restrictions herein imposed, all other powers which are reasonably necessary or essential to carry out the expressed objects and purposes of this subtitle."

In light of the provisions of the statute, we agree with the Commission that it is empowered to approve that rate structure which it finds to be most reasonable under the circumstances.

*Case remanded to the Circuit Court for Baltimore County for modification of its order in accordance with this opinion.*
*Each party to pay its own costs.*